## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------x
                             :
QUETLISE CAMILLE             :    Civ. No. 3:17CV01283(SALM)
                             :
v.                           :
                             :
NANCY A. BERRYHILL,          :    July 27, 2018
ACTING COMMISSIONER, SOCIAL  :
SECURITY ADMINISTRATION      :
                             :
-----------------------------x
```

## RULING ON CROSS MOTIONS

Plaintiff Quetlise Camille ("plaintiff"), brings this appeal under §205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. §405(g), seeking review of a final decision by the Commissioner of the Social Security Administration (the "Commissioner" or "defendant") denying her application for Supplemental Security Income ("SSI") for the period of January 1, 2012, through September 11, 2015. Plaintiff has moved for an order reversing that portion of the Commissioner's decision denying her benefits, or in the alternative to remand for a rehearing. [Doc. #22]. Defendant has filed a cross-motion seeking an order affirming the decision of the Commissioner. [Doc. #24].

For the reasons set forth below, plaintiff's Motion for Order Reversing the Decision of the Commissioner or in the Alterative Motion for Remand for a Rehearing **[Doc. #22]** is

**DENIED**, and defendant's Motion for an Order Affirming the Decision of the Commissioner **[Doc. #24]** is **GRANTED**.

## I.    PROCEDURAL HISTORY[1]

Plaintiff filed an application for SSI on May 29, 2013, alleging disability beginning January 1, 2012. See Certified Transcript of the Administrative Record, Doc. #18, compiled on September 22, 2017, (hereinafter "Tr.") at 533-41. Plaintiff's application was denied initially on November 20, 2013, see Tr. 476-79, and upon reconsideration on June 2, 2014. See Tr. 481-83.

On November 4, 2015, plaintiff, represented by Attorney Olia Yelner, appeared and testified at a hearing before Administrative Law Judge ("ALJ") Robert A. DiBiccaro. See Tr. 41-84. Vocational Expert ("VE") Jack Bock testified at the administrative hearing by telephone. See Tr. 69-81; see also Tr. 599-603. On January 28, 2016, the ALJ issued a partially favorable decision, finding that plaintiff became disabled within the meaning of the law as of September 12, 2015. See Tr. 19-40. On May 31, 2017, the Appeals Council denied plaintiff's request for review, thereby making the ALJ's January 28, 2016,

---

[1] Plaintiff filed a joint medical chronology on behalf of both parties. See Doc. #22-2.

decision the final decision of the Commissioner. <u>See</u> Tr. 1-6.
The case is now ripe for review under 42 U.S.C. §405(g).

Plaintiff timely filed this action for review and now moves
to reverse the Commissioner's decision, or alternatively, to
remand for a rehearing. [Doc. #22]. On appeal, plaintiff argues:

1. The ALJ erred at step three of the sequential evaluation;

2. The ALJ failed to properly weigh the medical opinion
   evidence;

3. The ALJ's Residual Functional Capacity ("RFC")
   determination fails to include all of plaintiff's
   impairments; and

4. The ALJ's step five determination is not supported by
   substantial evidence.

<u>See generally</u> Doc. #22-1 at 20-37. For the reasons stated below,
the Court finds that ALJ DiBiccaro did not err as contended and
his decision is supported by substantial evidence.

## II.  <u>**STANDARD OF REVIEW**</u>

The review of a Social Security disability determination
involves two levels of inquiry. <u>First</u>, the Court must decide
whether the Commissioner applied the correct legal principles in
making the determination. <u>Second</u>, the Court must decide whether
the determination is supported by substantial evidence. <u>See</u>
<u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998) (citation

omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The reviewing court's responsibility is to ensure that a claim has been fairly evaluated by the ALJ. See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983) (citation omitted).

The Court does not reach the second stage of review – evaluating whether substantial evidence supports the ALJ's conclusion – if the Court determines that the ALJ failed to apply the law correctly. See Norman v. Astrue, 912 F. Supp. 2d 33, 70 (S.D.N.Y. 2012) ("The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." (citing Tejada v. Apfel, 167 F.3d 770, 773-74 (2d Cir. 1999))). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made

according to the correct legal principles." <u>Johnson v. Bowen</u>,
817 F.2d 983, 986 (2d Cir. 1987).

"[T]he crucial factors in any determination must be set
forth with sufficient specificity to enable [a reviewing court]
to decide whether the determination is supported by substantial
evidence." <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984)
(alterations added) (citing <u>Treadwell v. Schweiker</u>, 698 F.2d
137, 142 (2d Cir. 1983)). The ALJ is free to accept or reject
the testimony of any witness, but a "finding that the witness is
not credible must nevertheless be set forth with sufficient
specificity to permit intelligible plenary review of the
record." <u>Williams ex rel. Williams v. Bowen</u>, 859 F.2d 255, 260-
61 (2d Cir. 1988) (citing <u>Carroll v. Sec. Health and Human
Servs.</u>, 705 F.2d 638, 643 (2d Cir. 1983)). "Moreover, when a
finding is potentially dispositive on the issue of disability,
there must be enough discussion to enable a reviewing court to
determine whether substantial evidence exists to support that
finding." <u>Johnston v. Colvin</u>, No. 3:13CV00073(JCH), 2014 WL
1304715, at *6 (D. Conn. Mar. 31, 2014) (citing <u>Peoples v.
Shalala</u>, No. 92CV4113, 1994 WL 621922, at *4 (N.D. Ill. Nov. 4,
1994)).

It is important to note that in reviewing the ALJ's
decision, this Court's role is not to start from scratch. "In

reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012) (quoting <u>Lamay v. Comm'r of Soc. Sec.</u>, 562 F.3d 503, 507 (2d Cir. 2009)). **"[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports <u>the ALJ's decision</u>.**" <u>Bonet ex rel. T.B. v. Colvin</u>, 523 F. App'x 58, 59 (2d Cir. 2013) (citations omitted)

## III. <u>SSA LEGAL STANDARD</u>

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. §423(a)(1).

To be considered disabled under the Act and therefore entitled to benefits, plaintiff must demonstrate that she is unable to work after a date specified "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Such impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §416.920(c) (requiring that the impairment "significantly limit[] ... physical or mental ability to do basic work activities" to be considered "severe" (alterations added)).[2]

There is a familiar five-step analysis used to determine if a person is disabled. See 20 C.F.R. §416.920. In the Second Circuit, the test is described as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

---

[2] Some of the Regulations cited in this decision were amended, effective March 27, 2017. Throughout this decision, and unless otherwise specifically noted, the Court applies and references the versions of those Regulations that were in effect at the time of the ALJ's decision. See Lowry v. Astrue, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (applying and referencing version of regulation in effect when ALJ adjudicated plaintiff's claim); see also Alvarez v. Comm'r of Soc. Sec., No. 14CV3542(MKB), 2015 WL 5657389, at *11 n.26 (E.D.N.Y. Sept. 23, 2015) ("[T]he Court considers the ALJ's decision in light of the regulation in effect at the time of the decision." (citing Lowry, 474 F. App'x at 805 n.2)).

<u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982) (<u>per curiam</u>). If and only if the claimant does <u>not</u> have a listed impairment, the Commissioner engages in the fourth and fifth steps:

> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of proof as to the first four steps, while the Secretary must prove the final one.

<u>Id.</u>

"Through the fourth step, the claimant carries the burdens of production and persuasion, but if the analysis proceeds to the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform given [her] residual functional capacity." <u>Gonzalez ex rel. Guzman v. Dep't of Health and Human Serv.</u>, 360 F. App'x 240, 243 (2d Cir. 2010) (alteration added) (citing 68 Fed. Reg. 51155 (Aug. 26, 2003)); <u>Poupore v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009) (<u>per curiam</u>)). The RFC is what a person is still capable of doing despite limitations resulting from his physical and mental impairments. <u>See</u> 20 C.F.R. §416.945(a)(1).

"In assessing disability, factors to be considered are (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978). "[E]ligibility for benefits is to be determined in light of the fact that 'the Social Security Act is a remedial statute to be broadly construed and liberally applied.'" Id. (quoting Haberman v. Finch, 418 F.2d 664, 667 (2d Cir. 1969)).

## IV.   **THE ALJ'S DECISION**

Following the above-described five-step evaluation process, the ALJ concluded that plaintiff "was not disabled prior to September 12, 2015, but became disabled on that date and has continued to be disabled through the date" of his decision. Tr. 36. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 1, 2012. See Tr. 26. At step two, the ALJ found: "Since the alleged onset date of disability, January 1, 2012, the claimant had the following severe impairments: obesity, degenerative disc disease, L5-S1 radiculopathy and depressive disorder[.]" Id. The ALJ found plaintiff's anemia, hypertension,

fibroid uterus and hemorrhagic ovarian cyst to be non-severe
impairments. See id.

At step three, the ALJ found that since January 1, 2012,
plaintiff's impairments, either alone or in combination, did not
meet or medically equal the severity of any of the listed
impairments in 20 C.F.R. § Pt. 404, Subpt. P, App. 1. See Tr.
26-28. The ALJ specifically considered Listings 1.04 (disorders
of the spine) and 12.04 (affective disorders) in making that
determination. See id. Before moving on to step four, the ALJ
found that since January 1, 2012, plaintiff had the RFC

> to perform sedentary work as defined in 20 CFR 416.967(a)
> except: She is able to perform occasional climbing,
> balancing, stooping, crawling, crouching and kneeling
> with no pushing or pulling with the right lower
> extremity. She requires a hand-held assistive device for
> ambulation and must change positions every 30 to 60
> minutes. The job should require less than 30 days to
> learn, and involve only simple instructions and routine,
> repetitive tasks with occasional interaction with
> supervisors, coworkers and the public.

Tr. 29. At step four, the ALJ concluded that since January 1,
2012, plaintiff was unable to perform any past relevant work.
See Tr. 34. The ALJ found: "Prior to the established disability
onset date, the claimant was a younger individual age 45-49. On
September 12, 2015, the claimant's age category changed to an
individual closely approaching advanced age." Id. At step five,
the ALJ found that prior to September 12, 2015, and after
considering plaintiff's age, education, work experience and RFC,

as well the testimony of the VE, other jobs existed in significant numbers in the national economy that plaintiff could perform. See Tr. 34-35. The ALJ then determined: "Beginning on September 12, 2015, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 416.960(c) and 416.966)." Tr. 35.

## V.   DISCUSSION

Plaintiff raises several arguments in support of reversal or remand. The Court addresses each in turn.

### A.   *Step Three*

Plaintiff claims the ALJ erred at step three of the sequential evaluation. See generally Doc. #22-1 at 20-26. Plaintiff asserts: "The medical records contain descriptions of all of the clinical signs and symptoms necessary to meet or to be equivalent to the Listing of Section 1.04(A) and 1.04(C)." Id. at 20 (footnotes omitted).[3] Over six pages of her brief, plaintiff lists the evidence of record that allegedly supports that contention. See id. at 21-26. Defendant responds that the

---

[3] At the administrative hearing level, plaintiff argued that she met Listing 1.04A. See Tr. 26, 605-06. She did not assert that she met Listing 1.04C.

ALJ properly concluded that plaintiff's impairments did not meet or medically equal Listing 1.04. See generally Doc. #24-1 at 3-5.

> Listing 1.04 addresses disorders of the spine:
>
> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> OR
>
> ...
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§1.04A, C.

At step three, the ALJ specifically "considered the claimant's degenerative disc disease under Listing 1.04 (Disorders of the spine) but concludes the claimant's condition does not satisfy the severity requirements of this listed impairment, as she does not have the requisite neurological

~ 12 ~

deficits." Tr. 26. The ALJ then detailed the relevant medical evidence of record supporting his conclusion that plaintiff's impairment did not meet or medically equal Listing 1.04 during the relevant time period. See Tr. 27; see also Tr. 31.

Before addressing the parties' respective arguments, the Court notes that plaintiff "bears the burden of proof" at step three of the sequential evaluation. Talavera, 697 F.3d at 151. "For a claimant to show that h[er] impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

### 1.    Listing 1.04A

"In order to satisfy Listing 1.04A, plaintiff must demonstrate that she suffers from nerve root compression and each of the four characteristics set forth in the Listing during the relevant time period, as an impairment that manifests only some of those criteria, no matter how severe, does not qualify." Elderkin v. Berryhill, No. 3:17CV90(JGM), 2018 WL 704137, at *10 (D. Conn. Feb. 5, 2018) (citation and internal quotation marks omitted); see also Loescher v. Berryhill, No. 16CV300(FPG), 2017 WL 1433338, at *4 (W.D.N.Y. Apr. 24, 2017) (To establish that plaintiff meets Listing 1.04 he "must demonstrate that he suffers from nerve root compression and each of the four

characteristics set forth in the Listing during the relevant time period." (emphasis added)).

There is no dispute that the objective medical evidence establishes that plaintiff suffers from a disorder of the spine which results in the compromise of a nerve root. See, e.g., Tr. 868 (June 2, 2011, MRI of plaintiff's lumbar spine); Tr. 217 (January 18, 2015, MRI of plaintiff's lumbar spine); Tr. 215-16 (March 4, 2015, Electromyography Report). The ALJ acknowledges that in his decision. See Tr. 27. Where there is disagreement, however, is whether plaintiff's impairments meet each of the four other criteria required by Listing 1.04A.

The ALJ determined that plaintiff's "physical examinations lack the requisite neurological deficits[,]" and noted that plaintiff had "evidence of normal muscle tone with no atrophy[,]" an ability "to walk small steps without her cane" and "5/5 strength in her lower extremities[.]" Tr. 27. The ALJ then summarized the other relevant evidence of record supporting that conclusion when addressing plaintiff's RFC. See Tr. 31. For the reasons that follow, the ALJ's determination that plaintiff did not have the requisite neurological deficits to satisfy the requirements of Listing 1.04A during the relevant time period is supported by substantial evidence of record.

Although not addressed by the parties, the Court first notes that in plaintiff's case there is involvement of the lower back. See, e.g., Tr. 217 (January 18, 2015, MRI: "At L5/S1 there is grade 1 anterolisthesis of L5 relative to S1, and chronic bilateral pars defects at L5."); Tr. 216 (March 4, 2015, Electromyography Report: "Electrodiagnostic examination reveals electrical evidence of L5 and S1 radiculopathies. The degree of involvement is severe and the same as that seen on her previous EMG in 2011."); Tr. 171, 177 ("c/o Low back pain" (sic)). Despite the involvement of plaintiff's lower back, the record lacks substantial evidence of positive straight-leg raising tests. See, e.g., Tr. 258 (January 19, 2015, physical examination: "Straight leg raising is negative."); Tr. 126 (July 1, 2015, physical examination: "SLR: negative"); Tr. 865 (May 27, 2011, report of Dr. Levine: "Straight leg raising and Patrick's signs are negative bilaterally."); but see Tr. 442 ("positive SLR test"). Indeed, the ALJ noted that as of May 2011, plaintiff had "normal muscle tone with negative straight leg testing[.]" Tr. 31 (citing Exhibit 7F/64-65).

Although there is conflicting evidence in the record on the other criteria of Listing 1.04A, the question here is whether substantial evidence supports the ALJ's decision – not whether there is substantial evidence to support the plaintiff's

position. See Bonet, 523 F. App'x at 59. Although the evidence reflects that plaintiff suffers from a severe impairment, substantial evidence supports the ALJ's conclusion that plaintiff's condition does not satisfy the other neurological deficits required by Listing 1.04A. For example, on several occasions, plaintiff was noted to have normal to near-normal muscle tone in the lower extremities with full strength, or near full strength, during motor examinations. See Tr. 244, Tr. 251, Tr. 258, Tr. 264, Tr. 430, Tr. 655, Tr. 1000, Tr. 1008, Tr. 1073.

Additionally, although there is evidence of plaintiff having some muscle wasting, see, e.g., Tr. 263, 377, 722, plaintiff's physical examinations lack the requisite findings to constitute "significant motor loss" as that term is defined by the listings. Listing 1.00E.1. provides: "[A] report of atrophy is not acceptable as evidence of significant motor loss without circumferential measurements of both thighs and lower legs[.] ... Additionally a report of atrophy should be accompanied by measurement of the strength of the muscle(s) in question generally based on a grading system of 0 to 5, with 0 being complete loss of strength and 5 being maximum strength." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 Listing 1.00E.1. Here, there is no evidence of circumferential measurements of plaintiff's

lower extremities. Also, as recited above, plaintiff's lower extremities were often found at maximum, or near maximum, strength. See Tr. 244, Tr. 251, Tr. 258, Tr. 264, Tr. 430, Tr. 1000, Tr. 1008, Tr. 1073.

The Listings also provide that an "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 Listing 1.00E.1. The record contains conflicting evidence about plaintiff's abilities in that regard. See, e.g., Tr. 126, 864 (heel walking); Tr. 306-07 (July 13, 2011, Physical Therapy Discharge Summary: plaintiff can independently transfer to/from sit and stand without the use of her hands, but with difficulty); Tr. 676 (May 30, 2013, Physical Therapy Discharge Summary: "Transfers are improved to maximum level of function – Met").[4] Plaintiff, who bears the burden at this step, in her thorough recitation of evidence, does not point the Court to any evidence that would otherwise satisfy a finding of significant motor loss. "Genuine conflicts in the medical evidence are for the Commissioner to resolve." Veino v. Barnhart, 312 F.3d 578,

---

[4] An April 30, 2013, Physical Therapy Initial Evaluation indicates that transfer goals included: independent transfer to/from bed without an assistive device; independent transfer to/from chair with a straight cane. See Tr. 678.

588 (2d Cir. 2002). Here, "it was within the province of the ALJ to resolve that evidence in the way []he did." Id.

Accordingly, the ALJ's determination that plaintiff's impairments did not meet Listing 1.04A is supported by substantial evidence of record.

### 2. Listing 1.04C

Listing 1.04C requires a showing of "[l]umbar spinal stenosis" resulting in an "inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.04C. In his decision, the ALJ stated: "The record does reflect ongoing gait problems throughout the record; however, the claimant's condition does not reach the listing level criteria based upon the objective testing. Indeed the claimant's daily activities of cooking meals and caring for her two young children, further support greater abilities." Tr. 27.

The listings define an inability to ambulate effectively as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 Listing 1.002b(1). "Ineffective ambulation is defined generally as having insufficient lower extremity functioning ... to permit independent ambulation without the use of a hand-held assistive

device(s) that limits the functioning of both upper extremities." Id. "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 Listing 1.002b(2).

Throughout the record are references to plaintiff's impaired gait and use of a cane. See, e.g., 254, 259, 264, 760, 979. However, as noted by the ALJ, plaintiff's gait difficulties and use of a cane do not reach listing level criteria. See Tr. 27, 31. On January 19, 2015, it was noted that although plaintiff had a quad cane and walker at home, plaintiff "generally walks with a standard cane." Tr. 254. During that visit, it was also reported that plaintiff "is independent in mobility and activities of daily living." Id. After physical therapy in 2011, plaintiff was able to ambulate 500 feet independently with the use of a straight cane. See Tr. 306. It was noted upon discharge from that treatment that plaintiff "ambulates independently using [a straight cane] maintaining good balance. Pt demonstrates ability to stand for periods of 20 min during therapy sessions." Tr. 307. Following her discharge from physical therapy in 2013, plaintiff was able to ambulate independently over even terrain with the use of a straight cane.

See Tr. 676. During the administrative hearing, plaintiff reported that she was able to walk for thirty minutes at a time. See Tr. 58.

Similarly, in 2013, plaintiff reported that she was able to walk "a few block with my cane," Tr. 576 (sic), and that she was able to shop in stores for her children's clothes. See Tr. 576. Plaintiff also stated that she was able to prepare "easy" meals and perform chores with the assistance of her husband. See Tr. 572-73. On June 26, 2015, it was noted that plaintiff was "overall able to do ADLs with meds." Tr. 128.

Finally, although the record references that plaintiff uses a walker on occasion, see Tr. 252, Tr. 254, the record generally supports a finding that plaintiff typically uses a cane, not a walker, for ambulation. See, e.g., Tr. 130, 252, 306, 589, 666. The use of a cane does not support a finding that plaintiff is unable to ambulate effectively, because the use of a cane does not limit the use of both upper extremities. See, e.g., Serrano v. Astrue, No. 3:10CV468(JCH), 2011 WL 1399465, at *8 (D. Conn. Apr. 12, 2011) ("The use of a cane does not meet the regulation's definition of an inability to ambulate ineffectively because the use of a cane impacts the functioning of one hand/arm only."). Indeed, portions of the record note that on occasion, plaintiff did not require the use of a cane.

See, e.g., Tr. 130 (June 24, 2015, treatment note: "Patient stated she felt better two days last week and did not have to use her cane, but was in severe pain over the weekend[.]"); Tr. Tr. 864 (Plaintiff "uses a cane most of the time.").

Accordingly, substantial evidence also supports the ALJ's determination that plaintiff's impairments do not meet Listing 1.04C.

### 3. Medical Equivalence

Finally, plaintiff contends that her "combined lumbar impairments are so severe, and cause such a high level of pain and restriction, that they are medically equivalent to Listing 1.04(A) and (B)." Doc. #22-1 at 26. Plaintiff, however, fails to present any additional argument on this point, inviting the Court to engage in pure conjecture as to how plaintiff's lumbar impairments medically equal those listings.[5] The regulations provide that medical equivalence may be found in three ways. See 20 C.F.R. §416.926(b). Plaintiff does not indicate in which of those three ways her conditions are equivalent to a listed impairment, nor does she adequately present any such argument to permit meaningful review on said point. See Schneider v.

---

[5] Presumably plaintiff's reference to Listing 1.04B is a typographical error, because plaintiff marshals no evidence in support of the conclusion that plaintiff meets Listing 1.04B.

Kissinger, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))). Accordingly, the Court declines to fill in the gaps of plaintiff's argument and will not further address the issue of medical equivalence.

**B.  *Weighing of Opinion Evidence***

Plaintiff next contends that the ALJ erred in weighing the opinion evidence. See Doc. #22-1 at 26-31. Plaintiff asserts that the ALJ erred by ascribing minimal weight to the combined opinion of her treating sources, and great weight to the opinions of the non-examining state reviewing physicians. See generally id. Plaintiff also argues that the ALJ did not provide good reasons for discounting the opinion of her treating sources. See id. at 28, 30-31. Defendant generally responds that the ALJ afforded proper weight to the medical opinions of record. See generally Doc. #24-1 at 6-11.

> **1. 2013 State of Connecticut Department of Social Services Medical Report completed by Katherine Taveras, LCSW, and co-signed by Dr. Lori Weir and Dr. Tichianaa Armah**

The record contains a State of Connecticut Department of Social Services Medical Report dated October 24, 2013, which was completed by Katherine Taveras, LCSW, and co-signed by Dr.

Tichianaa Armah and Dr. Lori Weir (hereinafter referred to as
the "2013 DSS Report"). See Tr. 690-99. With respect to that
report, the ALJ stated:

> The undersigned considered the medical report submitted
> by Katherine Taveras, LCSW, and cosigned by Lori Weir,
> M.D., from Day Street Community Health Center, which
> noted a new onset of mood disorder and chronic pain that
> prevented the claimant from performing work activities
> for at least 12 months or more (Exhibit 3F). These
> opinions are given minimal weight. Importantly, the
> forms were completed for purposes of assisting the
> claimant in obtaining a medical card. It is unclear if
> the author is familiar with the Social Security
> Administration's disability evaluation program or the
> evidence of record. Moreover, the doctor's statement
> indicating the claimant is "unable to work," is not a
> medical opinion, but rather an administrative finding
> dispositive of a case. These issues are reserved to the
> Commissioner, and as such are not entitled to any special
> significant weight[.] ... Instead, the undersigned
> relies on the longitudinal treatment notes from various
> treating sources, which provide a basis of support for
> the sedentary residual functional capacity.

Tr. 33.

### a)    Reasons for Discounting the Report

Plaintiff contends that the ALJ failed to provide good

reasons for discounting the 2013 DSS Report. See Doc. #22-1 at

30-31. When weighing any medical opinion, the Regulations

require that the ALJ consider the following factors: length of

treatment relationship; frequency of examination; nature and

extent of the treatment relationship; relevant evidence used to

support the opinion; consistency of the opinion with the entire

record; and the expertise and specialized knowledge of the

source. <u>See</u> 20 C.F.R. §§416.927(c)(2)-(6); Social Security Ruling ("SSR") 96-2P, 1996 WL 374188, at *2 (S.S.A. July 2, 1996); SSR 06-03P, 2006 WL 2329939, at *3-4 (S.S.A. Aug. 9, 2006). The Second Circuit does not require a "slavish recitation of each and every factor [of 20 C.F.R. §416.927(c)] where the ALJ's reasoning and adherence to the regulation are clear." <u>Atwater v. Astrue</u>, 512 F. App'x 67, 70 (2d Cir. 2013) (citing <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31-32 (2d Cir. 2004) (<u>per curiam</u>)).

Plaintiff first takes issue with the ALJ having discounted the 2013 DSS Report because it was "completed for the purposes of assisting the claimant in obtaining a medical card[.]" Doc. #22-1 at 28 (citing Tr. 33). Plaintiff's brief, however, fails to acknowledge the ALJ's reasoning in connection with that statement. The ALJ <u>actually</u> stated: "Importantly, the forms were completed for purposes of assisting the claimant in obtaining a medical card. It is unclear if the author is familiar with the Social Security Administration's disability evaluation program or the evidence of record." Tr. 33. The Regulations explicitly provide that the ALJ may consider "other factors," such as a medical source's familiarity with the record and his or her understanding of the SSA's disability program, when determining how much weight to provide a medical source's statement. 20

C.F.R. §416.927(c)(6) ("[T]he amount of understanding of our
disability programs and their evidentiary requirements that a
medical source has, regardless of the source of that
understanding, and the extent to which a medical source is
familiar with the other information in your case record are
relevant factors that we will consider in deciding the weight to
give to a medical opinion.") Accordingly, the ALJ did not err by
discounting the 2013 DSS Report on this basis.

Plaintiff next contends that the ALJ failed to consider:
the length of her treating relationship with Dr. Weir and Dr.
Armah; whether those doctors were specialists; and whether their
opinions were supported by, or consistent with, the record. See
Doc. #22-1 at 30-31. Although the ALJ did not explicitly
consider such factors, it is apparent from his decision that he
indeed considered the appropriate factors when deciding the
weight to ascribe to the 2013 DSS Report. See, e.g., Cichocki v.
Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) ("[R]emand is not
required where 'the evidence of record permits us to glean the
rationale of an ALJ's decision[.]'" (quoting Mongeur v. Heckler,
722 F.2d 1033, 1040 (2d Cir. 1983))).

As to the length of plaintiff's treatment relationship with
Dr. Weir and Dr. Armah, the 2013 DSS Report explicitly states
that plaintiff was first seen on May 24, 2011. See Tr. 693. The

record confirms that Dr. Weir first saw plaintiff on that date. See Tr. 442 (May 24, 2011, treatment note: "Reason for Appointment 1. Establish care" (sic)). As to Dr. Armah, although the exact date on which she first treated plaintiff is unclear, and plaintiff offers no clarification on that point, the ALJ explicitly considered two of Dr. Armah's notes, each of which date to 2014. See Tr. 32 (citing Exhibit 4F at 13, 23, reflected at Tr. 711 and 722 of the record). Accordingly, the Court is able to glean from the ALJ's decision that he considered the treatment relationship between plaintiff and these two providers. See, e.g., Daniel v. Berryhill, No. 3:17CV01015(SALM), 2018 WL 2128380, at *6 (D. Conn. May 9, 2018) (finding that the ALJ implicitly considered a treating physician's relationship with plaintiff where the ALJ "explicitly considered [the physician's] treatment notes throughout his decision[,]" and where the physician's opinion stated the date on which he first saw plaintiff).

As to Dr. Weir and Dr. Armah's "specialties," it is not apparent that the ALJ considered that factor, but here, that failure is of no import and, if anything, would constitute harmless error. Plaintiff asserts that Dr. Weir is a "board-certified Family Medicine Physician[.]" Doc. #22-1 at 30. The Regulations provide that the SSA will "generally give more

weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. §416.927(c)(6). Dr. Weir practices family medicine; she is not a specialist in any of the relevant fields, i.e., neurology, orthopedics, or psychiatry. See, e.g., Annabi v. Berryhill, No. 16CV9057(BCM), 2018 WL 1609271, at *7 n.12 (S.D.N.Y. Mar. 30, 2018) ("Dr. Johnston was board-certified only in family medicine. He was not an orthopedist, a neurologist, or a pain specialist."); see also Carlsen v. Berryhill, No. 16CV3538(JFB), 2017 WL 4155333, at *11 (E.D.N.Y. Sept. 19, 2017) ("Dr. Carlson was a practitioner of family medicine and was not a specialist in orthopedics, physiatry, or other musculoskeletal discipline." (internal quotation marks omitted)). Accordingly, Dr. Weir's board certification in family medicine does not compel the conclusion that additional weight might have been afforded to the 2013 DSS Report had the ALJ considered that fact. Accordingly, any failure to consider Dr. Weir's "specialty" is harmless error. See Price v. Comm'r of Soc. Sec., No. 14CV9164(JPO), 2016 WL 1271501, at *4 (S.D.N.Y. Mar. 31, 2016) ("An error in application of the treating physician rule is harmless if 'application of the correct legal standard could

lead to only one conclusion.'" (quoting <u>Zabala v. Astrue</u>, 595
F.3d 402, 409 (2d Cir. 2010))).

As noted by the plaintiff in passing, the ALJ did not
explicitly reference the co-signature of Dr. Armah and did not
explicitly mention that Dr. Armah is a psychiatrist, <u>i.e.,</u> a
treating specialist in the appropriate field. <u>See</u> Doc. #22-1 at
28. Defendant does not acknowledge that point in her responsive
brief, presumably because plaintiff herself did not develop the
argument. However, even if plaintiff had appropriately briefed
this issue, the ALJ's failure to acknowledge the co-signature of
Dr. Armah, and thus her specialty, would be harmless error. Any
such error is harmless because the ALJ's decision to discount
the 2013 DSS Report was not based on the claim that it was not
authored by an "acceptable medical source," but rather on its
inconsistency with the longitudinal record. Indeed, the 2013 DSS
Report is also co-signed by Dr. Weir, which is expressly
acknowledged by the ALJ. <u>See</u> Tr. 33. Accordingly, the ALJ's
failure to <u>acknowledge</u> the co-signature of Dr. Armah is harmless
error. <u>See</u> <u>Mainella v. Colvin</u>, No. 13CV2453(JG), 2014 WL 183957,
at *4 (E.D.N.Y. Jan. 14, 2014) ("But even if it were clear that
the opinions in the Medical Source Statement were in fact Dr.
Mani's, and thus that the treating physician rule applied to the
Medical Source Statement, remand would still be unwarranted.

That is because the ALJ rejected the report not because it came from a non-physician source, but because the ALJ found it inconsistent with other record evidence. Thus, the ALJ's reasoning applies equally well to reject the Medical Source Statement even if it represents the opinion of a treating physician.").

Further, because of the discrepancies between Dr. Armah's opinion and the longitudinal record, there is no reason to believe that had the ALJ considered Dr. Armah's specialty, he would have afforded that portion of the 2013 DSS Report additional weight. Accordingly, the ALJ's failure to consider that specific factor is also harmless error. See Price, 2016 WL 1271501, at *4; Snyder v. Colvin, No. 5:13CV585(GLS)(ESH), 2014 WL 3107962, at *4 (N.D.N.Y. July 8, 2014) ("[A]dministrative legal error is harmless when the same result would have been reached had the error not occurred." (citation omitted)).

Plaintiff next contends that the ALJ did not consider the consistency of the 2013 DSS Report with the record as a whole. See Doc. #22-1 at 30-31. However, the ALJ explicitly stated when discounting the Report that it was unclear whether the authors of the Report were "familiar with ... the evidence of record." Tr. 33. That statement implies that the 2013 DSS Report was not consistent with the other evidence of record. The ALJ also noted

that rather than relying on the 2013 DSS Report, he "[i]nstead[]
... relies on the longitudinal treatment notes from various
treating sources, which provides a basis of support for the
sedentary residual functional capacity." Tr. 33. The reasonable
inference from that statement is that the Report was not
consistent with the "longitudinal treatment notes from various
treating sources[.]" Id. Thus, and as will be discussed further
below, it is apparent from the ALJ's decision that he considered
the entire record and found that the 2013 DSS Report was not
entirely consistent therewith.

Accordingly, for the reasons stated, the Court finds that
the ALJ appropriately considered the factors set forth at 20
C.F.R. §416.927 in weighing the 2013 DSS Report.

### b)    Weight ascribed to 2013 DSS Report

Plaintiff contends that the ALJ erred by not affording
controlling or significant weight to the 2013 DSS Report. See
Doc. #22-1 at 29-31.

> "The SSA recognizes a 'treating physician' rule of
> deference to the views of the physician who has engaged
> in the primary treatment of the claimant," Green-
> Younger, 335 F.3d at 106. According to this rule, the
> opinion of a claimant's treating physician as to the
> nature and severity of the impairment is given
> "controlling weight" so long as it "is well-supported by
> medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other
> substantial evidence in the case record." 20 C.F.R.
> §404.1527(d)(2); see, e.g., Green-Younger, 335 F.3d at
> 106; Shaw, 221 F.3d at 134.

Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); see also 20 C.F.R. §416.927(c)(2). If the opinion, however, is not "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques, then the opinion cannot be entitled to controlling weight. 20 C.F.R. §416.927(c)(2).

Here, the ALJ afforded minimal weight to the 2013 DSS report because it was not consistent with the longitudinal record. See Tr. 33. That assessment is supported by substantial evidence for the following reasons.

First, Dr. Armah opined, inter alia, that plaintiff was moderately to markedly limited in most areas pertaining to the ability to sustain concentration and persistence, and with respect to adaption. See Tr. 696-97. Such limitations are not supported by the record. For example, the two mental status exams in which plaintiff was found to have difficulty concentrating noted that plaintiff was only "minimally inattentive." See Tr. 712, 722 (emphasis added). The record otherwise largely reflects normal mental status examinations, including intact thought processes and minimal impairment in both judgment and insight. See, e.g., Tr. 116, 135, 147, 154, 157, 159, 203, 205, 311, 313, 317, 411, 413, 417, 703, 705. See also Tr. 451-52 (Dr. Rau's Psychiatric Review Technique at the initial level of review: "Difficulties in Maintaining

Concentration, Persistence of Pace: Mild"); Tr. 464 (Dr.
Cattanach's Psychiatric Review Technique at the reconsideration
level of review: "Difficulties in Maintaining Concentration,
Persistence of Pace: Mild"). Accordingly, the ALJ did not err in
affording minimal weight to the portion of the 2013 DSS Report
addressing plaintiff's mental residual functional capacity.

As to the opinion of Dr. Weir concerning plaintiff's
physical abilities, plaintiff generally asserts that Dr. Weir's
"findings are consistent with the litany of medical evidence
beginning in 2007[.]" Doc. #22-1 at 30. Dr. Weir opined, _inter_
_alia_, that plaintiff can: sit for two hours out of an eight-hour
workday; stand and walk for one hour during an eight-hour
workday; occasionally lift up to twenty pounds; occasionally
carry up to ten pounds; occasionally bend; frequently reach; and
never squat, crawl, or climb. See Tr. 693-94. Presumably, in
light of the ALJ's finding that plaintiff is capable of
sedentary work, plaintiff takes issue with the ALJ having
afforded minimal weight to Dr. Weir's opinion that plaintiff is
able to sit for only two hours in an eight-hour workday, as Dr.
Weir's other findings generally comport with the description of
sedentary work. See 20 C.F.R. §416.967(a) ("Sedentary work
involves lifting no more than 10 pounds at a time[.] Although a
sedentary job is defined as one which involves sitting, a

certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."); see also SSR 96-9p, 1996 WL 374185 (S.S.A. July 2, 1995) ("Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 'Occasionally' means occurring from very little up to one- third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday."). Plaintiff points to no evidence that supports Dr. Weir's conclusion that plaintiff is able to sit for only two hours out of an eight hour workday. That is significant as an ALJ "is entitled to rely not only on what the record says, but also on what the record does not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983). Notably, the opinions of the non-examining physicians each found plaintiff capable of sitting for about six hours in an eight-hour workday. See Tr. 453, 466. As to activities of daily living, plaintiff reported that her hobbies are watching television and reading, both of which are sedentary in nature. See Tr. 574. Plaintiff reported that her conditions did not affect her ability to sit. See Tr. 575. On June 26, 2015, plaintiff reported that she was "overall able to do ADLs with meds." Tr. 128. Although plaintiff

reported pain with sitting, see Tr. 119, 126, she also reported that the pain only increased with walking or bending. See Tr. 430. Plaintiff had also reported to her physical therapist that her pain levels at rest are "0/10." See Tr. 666, 668. Accordingly, Dr. Weir's assessment of plaintiff's ability to sit is not supported by substantial evidence of record, and the ALJ appropriately afforded minimal weight to that portion of the 2013 DSS Report addressing plaintiff's physical capabilities.

Finally, the ALJ correctly found that the 2013 DSS Report's conclusion that plaintiff is "'unable to work,' is not a medical opinion, but rather an administrative finding dispositive of the case[,]" which are "issues reserved to the Commissioner, and as such are not entitled to any special significant weight[.]" Tr. 33 (citation omitted). See Taylor v. Barnhart, 83 F. App'x 347, 349 (2d Cir. 2003); Valdez v. Colvin, 232 F. Supp. 3d 543, 553 (S.D.N.Y. 2017) (citation omitted); see also 20 C.F.R. §§416.927(d)(1)-(3).

### 2.    State Reviewing, Non-Examining Sources

Plaintiff next contends that the ALJ erroneously "favored the opinion of non-examining doctors and a non-physician state agency examiner, who had no treating relationship with Ms. Camille, over the consistent and supported opinions of two medical doctors ... whose opinions are consistent with the

medical record as a whole." Doc. #22-1 at 32.[6] Defendant responds

that the ALJ appropriately assigned great weight to the opinions

of Dr. Rau and Dr. Cattanach "because they were consistent with

Plaintiff's treatment notes and benign mental status

examinations." Doc. #24-1 at 6.

Plaintiff first contends that the ALJ inappropriately

relied on the opinions of the non-examining sources because they

did not have the benefit of plaintiff's entire medical record.

See Tr. 22-1 at 32. Although plaintiff fails to support that

argument with a citation to any authority, the Court is aware of

case law in this District which has found error when an ALJ

relied on the opinion of a non-examining source who did not have

the benefit of reviewing the entire record. See, e.g., Jazina v.

---

[6] Although plaintiff takes issue with the ALJ having "favored the
opinion of non-examining doctors and a non-physician state
agency examiner," Doc. #22-1 at 32, the substance of plaintiff's
brief raises issue only with the ALJ's reliance on the mental
RFC assessments authored by Dr. Rau and Dr. Cattanach, each of
whom is a Ph.D. See id. at 31 (citing Tr. 452 (Dr. Rau's
psychiatric review technique) and Tr. 455 (Dr. Rau's mental RFC
assessment), both of which were affirmed by Dr. Cattanach).
Accordingly, the Court limits its discussion to the weight
afforded to the assessments authored by Dr. Rau and Dr.
Cattanach. Plaintiff fails to develop any argument as to the
weight ascribed to the opinions of state reviewing examiners Dr.
Golkar and Dr. Kahn, each of whom authored a physical RFC
assessment. See Tr. 453-54, 466-67. Indeed, in the portion of
her brief addressing the weight ascribed to the non-examining
sources, plaintiff fails to identify Dr. Golkar or Dr. Khan by
name. Plaintiff also does not cite to any portion of their
physical RFC assessments.

_Berryhill_, No. 3:16CV01470(JAM), 2017 WL 6453400, at *7 (D.
Conn. Dec. 13, 2017). Here, however, the ALJ expressly
acknowledged and accounted for that fact when assessing the
weight to ascribe to the opinions of the non-examining sources:

> The residual functional capacity conclusions reached by
> the physicians and psychologists employed by the State
> Disability Determination Service (DDS) support a finding
> of not disabled with an ability to perform a range of
> unskilled medium work based upon their review of the
> available evidence (Exhibit 2A and 3A). However, less
> weight is assigned to the opinion because they were based
> on information contained in the record at the time that
> the assessments were made, and no medical records
> generated or provided after were considered by these
> doctors. Additional medical evidence received in the
> course of developing the claimant's case for review at
> the administrative hearing level; a different
> interpretation of the earlier records; and evidence in
> the form of testimony at the claimant's hearing,
> consistent with medical evidence in the record,
> justifies a conclusion that the claimant's impairments
> are more severe than was concluded by the state non-
> examining doctors. The undersigned finds the residual
> functional capacity as set out above is appropriate in
> light of the objective medical evidence and giving
> maximum credit to the claimant.
>
> However, great weight is given to the DDS mental health
> assessments made by the consultants Douglas Rau Ph.D.,
> and L. Cattanach, Ph.D., because subsequently received
> evidence is not inconsistent with their assessments.

Tr. 33-34. Accordingly, the Court finds no error in that regard.

Plaintiff essentially contends that the opinions of the
non-examining sources should not have overridden those of her
treating sources. See Doc. #22-1 at 32. It is well established
that "the opinions even of non-examining sources may

~ 36 ~

override treating sources' opinions and be given significant weight, so long as they are supported by sufficient medical evidence in the record." Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 427 (S.D.N.Y. 2010). As noted by the ALJ, the opinions of Dr. Rau and Dr. Cattanach are consistent with the record as a whole, including the numerous unremarkable mental status examinations documented throughout the record. See, e.g., Tr. 116, 135, 147, 154, 157, 159, 203, 205, 311, 313, 317, 411, 413, 417, 703, 705. Accordingly, the ALJ did not err in ascribing those opinions great weight.

As to the opinion of Dr. Weir, her assessment of plaintiff's physical capabilities is largely consistent with the RFC as determined by the ALJ. To the extent the ALJ relied on the non-examining source's determination as to plaintiff's ability to sit, that opinion is generally consistent with the record as previously discussed, supra.

Accordingly, the Court finds no error in the ALJ's reliance on the opinions of the non-examining sources.

C. **RFC**

Plaintiff next asserts that the ALJ's RFC determination is erroneous because it "lacks impairments as described by plaintiff and treating sources and agency physicians." Doc. #22-1 at 32. Specifically, plaintiff argues that the RFC should have

included a provision for a limited work schedule and limited plaintiff to less than sedentary work. See id. at 33-34.

Plaintiff contends that the need for a limited work schedule is specifically required by the opinion of Dr. Rau, to which the ALJ ascribed great weight. See Doc. #22-1 at 33. Plaintiff states:

> According to the opinion of state agency doctors, to whom the ALJ assigned "great weight" (Tr. 33) Ms. Camille has a "tendency to become easily overwhelmed ... Some modifications in tasks and expectations may be warranted. [Ms. Camille] may have some difficulty adhering to a normal work schedule in the beginning but would be able to attend work consistently through time." (Tr. 455).

Doc. #22-1 at 34. Plaintiff quotes Dr. Rau's assessment out of context. In providing a narrative explanation of plaintiff's adaptation capacities and/or limitations, Dr. Rau stated:

> In a work setting requiring simple and repetitive demands, clmnt. would be able to adapt to occasional changes in work tasks though these should be kept to a minimum due to clmnt's tendency to become easily overwhelmed. Residual depression may also negatively impact clmnt's ability to respond to frequent work place changes. Some modifications in tasks and expectations may be warranted. Clmnt may have some difficulty adhering to normal work schedule in beginning, but would be able to attend work consistently through time.

Tr. 455 (sic). Despite plaintiff's arguments to the contrary, Dr. Rau's explanation does not call for a "limited work schedule." Indeed, the ALJ's RFC determination accounts for any limitations in plaintiff's adaptation capabilities (as found by

Dr. Rau) by limiting plaintiff to a job involving "routine, repetitive tasks[.]" Tr. 29.

Plaintiff also relies on Dr. Armah's opinion in support of her position that she requires a limited work schedule. See Doc. #22-1 at 34. However, the ALJ properly ascribed that opinion limited weight as it is not consistent with the longitudinal record, including largely normal mental status examinations as previously discussed.[7] Accordingly, the Court finds no error in the omission of a limited work schedule from the RFC determination.

Plaintiff next contends that "[t]he ALJ should have limited her to less than sedentary exertion." Doc. #22-1 at 34. In support of that assertion, plaintiff generally relies on the opinion of Dr. Weir and two physical therapy notes. See id. at 34-35. The ALJ's RFC determination limiting plaintiff to sedentary work is supported by substantial evidence of record including: portions of Dr. Weir's opinion, see Tr. 963-94 (regarding plaintiff's abilities to walk, stand, lift and

---

[7] It is also significant that plaintiff did not claim limitations in performing her activities of daily living as a result of mental limitations. For example, plaintiff did not indicate that her conditions affected her memory, ability to complete tasks, concentration, or understanding. See Tr. 575; see also Tr. 445 and 458 (application for disability due to "[r]ight leg nerve damage" and "internal bleeding issues").

carry); the opinions of the non-examining physicians, see Tr. 453, 466 (regarding plaintiff's ability to sit in an eight-hour workday); plaintiff's treatment notes, see, e.g., Tr. 128, 244, 251, 258, 576, 666, 676, 864; plaintiff's self-reported activities of daily living, see Tr. 570-77 (plaintiff helps her children get ready for school, assists with cleaning and laundry, prepares easy food, shops in stores, and can walk a few blocks with her cane); and her testimony, see generally Tr. 58-63.[8] Accordingly, the Court finds the ALJ's RFC determination limiting plaintiff to sedentary work supported by substantial evidence of record.

D.  *Step Five*

Last, plaintiff asserts that she "should have been awarded benefits at Step Five because the testifying [VE], even based on the ALJ's RFC description, ... was unable to name jobs that actually exist in significant numbers in the national or state economy." Doc. #22-1 at 35. Defendant responds: "The ALJ properly relied on the [VE] testimony at step five to conclude that jobs exist in significant numbers in the national economy

---

[8] The Court further notes that the ALJ's RFC determination accounts for plaintiff's testimony that after about 45 minutes of sitting she needs to adjust her position. See Tr. 58-59.

that Plaintiff could perform, and thereby concluded that Plaintiff was not disabled under the Act." Doc. #24-1 at 12.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion and accurately reflects the limitations and capabilities of the claimant involved." McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014) (internal citation and quotation marks omitted); see also Mancuso v. Astrue, 361 F. App'x 176, 179 (2d Cir. 2010) (upholding an ALJ's hypothetical where "the ALJ's hypothetical mirrored [plaintiff's] RFC, which ... was supported by substantial evidence in the record[]"). Here, the ALJ presented the VE with a hypothetical which tracked the ultimate RFC determination. See Tr. 73-77. As previously stated, the ALJ properly weighed and considered the evidence of record, and the RFC determination is supported by substantial evidence. Accordingly, the ALJ appropriately relied on the VE's testimony at step five of the sequential evaluation.

Plaintiff specifically contends that the jobs the VE testified were available in significant numbers are not actually so available in either the national or regional economies. See

Doc. #22-1 at 36.[9] Defendant responds that because the VE

"testified that there are 150 microfilm preparer jobs in the

local economy ... the Commissioner met her burden at step

five[.]" Doc. #24-1 at 13. Defendant further asserts that "under

the Act, the local numbers are not relevant if the national

numbers are significant." Id. Because plaintiff does not

challenge the evidentiary basis for the VE's decision, the Court

focuses on whether the jobs identified by the VE exist in

"significant numbers" such to satisfy the Commissioner's burden

at step five of the sequential evaluation.[10]

In response to the hypothetical posed by the ALJ, which was

based on the ALJ's ultimate RFC determination, the VE testified

that three jobs were available for plaintiff to perform, in the

following numbers: (1) microfilm document preparer, 15,000 jobs

nationally, and 150 regionally; (2) address clerk, 7,000 jobs

nationally, and 50 in the state of Connecticut; and (3) cutter-

---

[9] In making this argument, plaintiff primarily relies on non-binding, out-of-Circuit authority, and largely ignores controlling and/or persuasive authority from within the Second Circuit.

[10] "[I]t is enough that a vocational expert identif[y] the sources he generally consulted to determine such figures[.]" Dugan v. Soc. Sec. Admin., Comm'r, 501 F. App'x 24, 25 (2d Cir. 2012). Here, the VE specifically identified the sources he consulted to determine the figures cited. See Tr. 78-79. During the administrative hearing, plaintiff's counsel did not object to that line of inquiry, or otherwise challenge the VE's testimony in that regard.

and-paster, 3,800 jobs nationally, and 30 in the state of Connecticut. See Tr. 76-77. Considering that testimony, the ALJ concluded that "prior to the established onset date of disability, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the <u>national economy</u>." Tr. 35 (emphasis added).

Although plaintiff focuses on the number of jobs available in the local economy, that number is not relevant, because the ALJ determined plaintiff could have performed a significant number of jobs in the national economy. See Tr. 35.

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §423(d)(2)(A). "[W]ork exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether ... [w]ork exists in the immediate area in which you live[.]" 20 C.F.R. §416.966(a)(1). "Neither the Social Security Act, nor the Commissioner's Regulations or Rulings

provide a definition for a 'significant' number of jobs." <u>Koutrakos v. Colvin</u>, No. 3:13CV1290(JGM), 2015 WL 1190100, at *21 (D. Conn. Mar. 16, 2015) (internal citations and quotation marks omitted). In this Circuit, "courts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers, but courts have adopted a relatively low threshold number." <u>Id.</u> (internal citations and quotation marks omitted).

Here, the ALJ did not err in concluding that 25,800 jobs nationally constituted a significant number. "[C]ourts in this District have routinely held that numbers below 30,000 are sufficient to satisfy the 'significant number' threshold." <u>Hernandez v. Berryhill</u>, No. 3:17CV368(SRU), 2018 WL 1532609, at *16 (D. Conn. Mar. 29, 2018) (collecting cases). Indeed, Courts in this Circuit have found fewer than 25,800 jobs in the national economy to constitute a significant number. <u>See, e.g.</u>, <u>Lillis v. Colvin</u>, No. 3:16CV269(WIG), 2017 WL 784949, at *6 (D. Conn. Mar. 1, 2017) (finding 16,770 jobs in the national economy to be "significant"); <u>Gilmore v. Comm'r of Soc. Sec.</u>, No. 7:15CV00837(NAM), 2016 WL 4079535, at *6 (N.D.N.Y. July 29, 2016) (The VE "testified to there being 20,620 jobs in the national economy, which the Court finds 'significant.'"); <u>Gray v. Colvin</u>, No. 12CV6485(DGL), 2014 WL 4146880, at *6 (W.D.N.Y.

Aug. 19, 2014) (finding "over 16,000 jobs nationally" to be "significant"); <u>Daniels v. Astrue</u>, No. 10CV6510(RWS), 2012 WL 1415322, at *17 (S.D.N.Y. Apr. 18, 2012) (deciding that the "ALJ properly found" that 25,000 jobs was "a significant number of jobs in the national economy"). Accordingly, substantial evidence supports the ALJ's determination that plaintiff could perform a significant number of jobs that existed in the national economy.[11]

Finally, plaintiff conclusorily contends that "the number of jobs that exist not matter when the sedentary occupational base has been significantly eroded, ... as it has been for Ms. Camille." Doc. #22-1 at 26 (internal citation omitted) (sic). Plaintiff fails to develop this argument and the Court declines to do so on her behalf. Accordingly, for the reasons stated, the Court finds the ALJ's step five determination is supported by substantial evidence of record.

## VI. <u>CONCLUSION</u>

For the reasons set forth herein, plaintiff's Motion for Order Reversing the Decision of the Commissioner or in the

---

[11] As to local numbers, courts have found less than 230 jobs in the local economy (the number identified here) to constitute a "significant number." <u>See, e.g.</u>, <u>Dumas</u>, 712 F.2d at 1549 (150 jobs); <u>Fox v. Comm'r of Soc. Sec.</u>, No. 6:02CV1160, 2009 WL 367628, at *3 (N.D.N.Y. Feb. 13, 2009) (200 jobs). Accordingly, plaintiff's argument is also unpersuasive on that point.

Alterative Motion for Remand for a Rehearing **[Doc. #22]** is

**DENIED,** and defendant's Motion for an Order Affirming the

Decision of the Commissioner **[Doc. #24]** is **GRANTED.**

SO ORDERED at New Haven, Connecticut, this 27th day of July,

2018.


_____/s/_____
          HON. SARAH A. L. MERRIAM
          UNITED STATES MAGISTRATE JUDGE